UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MATTHEW ALCON,

        Plaintiff,

   v.

DARRIN BRIGHT, D.O.,

        Defendant.

Case No. C14-01927 SI (pr)

**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

Matthew Alcon, an inmate in custody at the Correctional Training Facility in Soledad, California, filed this *pro se* civil rights action under 42 U.S.C. § 1983. This action is now before the Court for consideration of the motion for summary judgment filed by defendant. Plaintiff has filed an opposition, and defendant has filed a reply. For the reasons discussed below, summary judgment will be granted.

**BACKGROUND**

**A.   The Dispute**

The claim that remains for adjudication asserts that Dr. Darrin Bright was deliberately indifferent to Matthew Alcon's medical needs.[1] Before turning to the evidence, it is helpful to

---

[1] In his amended complaint under 42 U.S.C. § 1983, Alcon named four prison doctors in their individual capacities. Upon initial review, Magistrate Judge Cousins (to whom the action was originally assigned) determined that the amended complaint stated a § 1983 claim against Dr. Bright for deliberate indifference to Alcon's medical needs, and dismissed the three other defendants. *See* Docket No. 12. The action was later reassigned to the undersigned. Alcon did not allege a claim under the Americans with Disabilities Act ("ADA"), nor is there an

set out the basic components of the disagreement, because this action has a somewhat unusual medical care dispute. Dr. Bright was not Alcon's primary care provider. Instead, Dr. Bright was involved with Alcon's medical matters because he conducted medical evaluations in connection with responses to Alcon's inmate appeals and requests for accommodations under the ADA.

Alcon contends that Dr. Bright was deliberately indifferent to his medical needs in three ways: (1) Dr. Bright failed to approve a request for a dosage increase of Alcon's Neurontin prescription; (2) Dr. Bright failed to diagnose Alcon as having fibromyalgia; and (3) Dr. Bright failed to send Alcon to a rheumatologist who, unlike Dr. Bright, would have been qualified to diagnose and treat Alcon. Alcon requests damages, an order for his referral to a rheumatologist for "proper diagnosis of and treatment of his condition," and an order for doctors to provide him "adequate and effective pain management for his condition." Docket No. 10 at 15.

### B. The Facts

The following facts are undisputed, unless otherwise noted:

The events at issue occurred between May 2012 and July 2014 at the Correctional Training Facility (CTF) in Soledad. At the relevant time, Alcon was a prisoner at CTF.

Dr. Bright was a licensed physician, and for most of the relevant time was the chief physician and surgeon at CTF. Docket No. 34 at 1-2 (Bright Decl.). Dr. Bright was *not* Alcon's primary care provider. As chief physician and surgeon, Dr. Bright provided some primary care medical treatment and also supervised other professionals who provided medical and psychiatric care to inmates. His other duties as chief physician and surgeon included "advising medical staff, participating in the management of the healthcare division, examining and treating patients who need more difficult types of medical treatment, serving as a consultant for unusual and difficult medical problems, and recommending approval of new hospital policies." *Id.* at 2. Dr. Bright conducted medical evaluations and provided Health Care Services with reports of his

---

appropriate ADA defendant in this action. Alcon's issues appear to be more about medical care than accommodations.

2

findings when called upon to do so if an inmate filed a medical appeal or an ADA accommodation request. *See id.* at 9. Dr. Bright did not, however, decide the inmates' health care appeals. *See id.*

Dr. Bright is a doctor of osteopathic medicine. A doctor of osteopathy (D.O.) receives much of the same training that a medical doctor (M.D.) receives. The primary difference between D.O.s and M.D.s "lies in the philosophy on how to practice, which translates to the techniques used to diagnose and treat patients." *Id.* at 2. According to Dr. Bright, D.O.s "retain full practice rights and are licensed to provide medical and surgical services in all fifty states. Today, the distinction between osteopathic physicians and medical physicians is quite small." *Id.* Dr. Bright has been a licensed physician in the State of California since 1993. *Id.*

### 1. Fibromyalgia and Somatization Disorders

The parties disagree as to the medical condition Alcon has. Alcon presents evidence that several doctors have assessed him as having fibromyalgia, and Dr. Bright presents evidence that he has diagnosed Alcon as having somatization disorder. In extremely simple terms, the difference between fibromyalgia and somatization disorder is that fibromyalgia may involve widespread pain associated with overactive nerves, whereas somatization is a mental disorder in which the complaints of widespread pain have a mental rather than physical cause. Dr. Bright presented an extended explanation of the two conditions and the diagnostic challenges they present, which Alcon does not dispute.

> **Fibromyalgia** is a complex medical condition of unknown etiology and is characterized by widespread chronic pain, stiffness, and muscle tenderness (called "tender points"). These tender points are most commonly found on the neck, shoulders, back, hips, arms, and legs, and they hurt when touched. Patients diagnosed with fibromyalgia often exhibit other symptoms as well, which can include fatigue, sleep disturbance, abnormal pain processing, and psychological distress. Fibromyalgia can also result in morning stiffness, tingling or numbness on the hands and feet, headaches, irritable bowel syndrome, [and] cognitive problems with thinking and memory (sometimes called 'fibro fog'). . . . In general, people with fibromyalgia display strong reactions to things other individuals would not find painful.

3

Docket No. 34 at 3 (emphasis added). The exact cause of this disorder is unknown, although medical professionals believe it is associated with overactive nerves, and changes in the central nervous system may be responsible for symptoms. *Id.* There is no specific test used to diagnose fibromyalgia; instead, a physician "must rely solely on groups of exhibited symptoms" to make the diagnosis. *Id.* This can be a problem because the symptoms of fibromyalgia are common to many other disorders (especially mental health disorders), the symptoms can be transient, and the symptoms can have other causes. *Id.* The medical community "recognizes that patients claiming to be tender all over their [bodies] are more likely fabricating their symptoms or suffering from psychiatric disturbances." *Id.* at 3-4. Fibromyalgia is a diagnosis of exclusion—i.e., a doctor must rule out other causes for the symptoms before diagnosing fibromyalgia. *Id.* at 4.

> **Somatization disorder**, also known as somatoform disorder, is a long-term, mental condition that is characterized by frequent complaints about physical symptoms involving multiple parts of the body, but for which no physical cause can be found. It is commonly understood as conversion of mental experiences into bodily symptoms. People that suffer from somatization disorder tend to have many complaints, which last for years. Usually, the complaints relate to chronic pain involving several different areas of the body. For example, the same patient may experience back pain, headaches, chest discomfort, digestive problems, urinary distress, and anxiety.

*Id*. at 4 (emphasis added). Dr. Bright explains that many people believe somatization disorder "is related to brain functioning or the regulation of emotions as opposed to a problem with the area of the body that has become the focus of the patient's complaints." *Id.* at 5.

As with fibromyalgia, there is not an objective test to confirm a diagnosis of somatization. Dr. Bright states that a patient can be diagnosed with a somatization disorder if "thorough physical examination and diagnostic tests do not reveal a medical or physiological basis for the patient's symptoms." *Id*. at 5. Dr. Bright states that a psychological examination also is often performed to "allow the possibility of identifying related disorders. Typically, a person with somatization disorder also suffers from depression and anxiety." *Id.*

In at least one of his evaluations, Dr. Bright opined that it was possible that Alcon may have had conversion disorder as well as somatization disorder, although he focused much more

4

on the latter of these two very similar conditions. Dr. Bright describes conversion disorder as a "mental condition that manifests itself in neurological symptoms, such as numbness or paralysis, that is thought to arise in response to a particularly stressful situation." Docket No. 34 at 13.

### 2. Dr. Bright's Evaluations of Alcon

Alcon states in his amended complaint that he suffers from fibromyalgia syndrome and that several primary care providers ("PCPs") have assessed him as having fibromyalgia. Docket No. 10 at 6. (Even these doctors have failed to provide treatment Alcon believes is appropriate. Docket No. 10 at 6.).

In 2012, Alcon's primary care provider, Dr. Lam, requested an increased dosage of Neurontin "for fibromyalgia."[2] Docket No. 10-1 at 11. On May 15, 2012, Dr. Bright denied the request for an increased dosage and ended the prescription of Neurontin. *Id.*; Docket No. 34 at 17. Dr. Bright decided to end the Neurontin prescription because Alcon's lab results showed that he had low platelets, which is a condition that can be caused by Neurontin, and Alcon was receiving another pain medication. Docket No. 34 at 7. (Dr. Bright states that the other pain medication was Tylenol # 3 (i.e., Tylenol with codeine). *Id.* The medication reconciliation form dated May 16, 2012 does not list Tylenol # 3, but does list morphine sulfate ER for pain, as well as an anti-anxiety medication, an anti-seizure medication, and an antidepressant. Docket No. 10-1 at 12.) Dr. Bright declares that, in his medical judgment "the Neurontin prescription was unnecessary, and may have been doing him more harm than good." Docket No. 34 at 7.

---

[2] Neurontin is the brand name for gabapentin. During the relevant time, Neurontin was a nonformulary drug. Dr. Bright states in his declaration that the Neurontin was originally prescribed because Alcon had experienced seizures in the past and was kept on Neurontin as a prophylactic. According to Dr. Bright, both medical staff and neurologists later believed the seizures actually had been pseudo-seizures, i.e., a result of psychological problems rather than epileptic seizures. *See* Docket No. 34 at 7, 14-15.

Alcon appealed the medication decision. His inmate appeal was denied by Health Care Services. A board within Health Care Services decides whether to grant or deny an inmate's appeal. Docket No. 34 at 7. The Neurontin prescription was ended.

Alcon filed health care appeals and ADA accommodation requests to address his pain and to reinstate his medication. These appeals and requests led to several appointments with Dr. Bright for evaluation.

Dr. Bright evaluated Alcon in September 2012, after Alcon had complained to his PCP, Dr. Lam, of chronic pain from walking and standing. Dr. Lam requested housing accommodations and a mental health evaluation. Alcon received a mental health examination, but Dr. Bright denied the request for accommodations because, in his medical judgment, Alcon did not meet the medically objective criteria for the requested accommodations of an extra mattress and a ground floor cell. Docket No. 34 at 7-8. Alcon presents no evidence that he met any of the specific criteria in the California Correctional Health Care Services Policies and Procedures guidebook. *See* Docket No. 34-1 at 31, 36-37, 41. Although in September 2012 Dr. Bright denied the request for housing accommodations due to the lack of a medically verifiable problem, Dr. Bright granted Alcon a cane and a bottom bunk in a cell on the ground floor in November 2012.

Dr. Lam evaluated Alcon on January 31, 2013 due to Alcon's complaints of great pain even though he had taken his pain medication that morning. Alcon refused to provide a urine sample for urinary analysis. Alcon also refused Dr. Lam's suggestion that he be admitted to the outpatient housing unit to be monitored more closely and treated. Docket No. 34 at 9-10; Docket No. 34-2 at 6. Alcon was seen by medical professionals on eleven occasions from January 31 to June 14, 2013.

Dr. Bright evaluated Alcon on June 14, 2013 in response to Alcon's request for an ADA evaluation. Dr. Bright considered Alcon's complaints, did a physical examination, and reviewed X-rays of both feet, a CT scan of Alcon's head, five sets of lab data, reports from two consultations Alcon had with neurologists, and a report from a consultation Alcon had with a

1  podiatrist. Docket No. 34 at 10; Docket No. 34-2 at 38-43. In Dr. Bright's medical judgment,
2  Alcon's "symptoms did not comport with a finding [of] fibromyalgia." Docket No. 34 at 10. Dr.
3  Bright wrote the following assessment of Alcon:

> 1. History of 'fibromyalgia.' The patient does not have findings of fibromyalgia. He has positive tenderness to points all over his body including his forehead, volar arm, and nail beds which are not consistent with fibromyalgia. He has no other medical physiologic reason for having total body pain. His laboratory results are normal. His x-rays are normal. This patient has tender points in every part of his body. He includes tender points that are consistently not involved with fibromyalgia. He is hypersensitive to pain, even to light touch, which is again not consistent with fibromyalgia. This patient does not have other connective tissue disorders such as myositis. He has no central proximal weakness. He has no point tenderness over single muscle groups that may be consistent with myositis. He has no indication of an inflammatory process or arthritides. There is no medical disorder that has total body pain. He is either malingering or possible but less likely a conversion disorder.
>
> 2. Possible seizure disorder. Neurology feels that he may have pseudoseizures; however, this is still questioned.
>
> 3. Plantar fasciitis. The patient does not have plantar fasciitis. He is tender over his plantar fascia, but he is tender over his entire foot. His pain is not worse with his first step and gets better over time. It gets worse with every step. Again this is not consistent with fibromyalgia.

Docket No. 34-2 at 40-42. Dr. Bright's plan was to discuss weaning Alcon off morphine because there was no medical indication for it. Dr. Bright also wrote that Alcon had no medical indication for Neurontin; he noted that, although there was some anecdotal support for nighttime Neurontin for fibromyalgia, Alcon did not have fibromyalgia. Dr. Bright also wrote that Alcon did not qualify for a wheelchair, ground floor housing, an extra mattress, functional orthotics, or a cane. *Id.* at 42.

Alcon requested an evaluation by another physician. Dr. Friederichs performed another examination that same afternoon and diagnosed Alcon as having adjustment disorder and ordered a mental health consultation. Dr. Friederichs also sent Alcon to Outpatient Housing Unit ("OHU") to be weaned off his medication over the next couple of months.

During Alcon's stay at the OHU, he was evaluated by Dr. Hedden nine times. Docket No. 34 at 7. Dr. Hedden concluded that Alcon suffers from somatoform disorder. Dr. Hedden also denied Alcon's request to be seen by a rheumatologist for a diagnosis of fibromyalgia

7

because his symptoms did not meet the medical criteria for such a referral. Docket No. 34 at 11.

On August 29, 2013, Alcon was again evaluated by Dr. Bright after Alcon filed an administrative appeal of his ADA status. Docket No. 34 at 11-12. During this visit, Dr. Bright examined Alcon and determined that he did not have fibromyalgia. *Id.* at 12. The bases for Dr. Bright's determination were largely similar to those underlying his June 14, 2013 examination of Alcon. Dr. Bright also noted that Alcon's level of mobility had changed after the disability request was denied. Although he moved slowly and as if in pain before the evaluation, Alcon "briskly pushed his wheelchair down the hallway by himself without any complaints, without grimacing, and without difficulty" after being informed of the rejection. Docket No. 34 at 12. Based on all his observations and exercising his medical judgment, Dr. Bright denied the re-classification request, and diagnosed Alcon with somatization disorder. Dr. Bright informed Alcon that the Medical Services Department would work with the Psychiatry Department to help him overcome his somatization. Docket No. 34 at 12; *see* Docket No. 34-3 at 20-22. Alcon was displeased.

From September 2013 to July 2014, Alcon was monitored monthly and prescribed gabapentin and Tylenol to alleviate pain. Docket No. 34 at 13. He received physical therapy to assist him with walking. *Id*. Alcon also received monthly evaluations by the Psychiatry Department for somatization disorder and depression. *Id*. During this time, Alcon's PCP, Dr. Lam, requested that Alcon be evaluated by mental health services.[3] Docket No. 34-4 at 14.

On July 30, 2014, Dr. Bright conducted another examination of Alcon in connection with his requests for accommodations. Docket No. 34-4 at 22-30. Dr. Bright states that after considering multiple treatment plans, he granted Alcon the use of crutches as the most effective, efficient, and medically ethical treatment. Docket No. 34 at 8. Dr. Bright also ordered that Alcon continue to work with mental health services to treat his somatization. *Id*. Dr. Bright's

---

[3] Dr. Bright states that, "[e]ven Dr. Lam, who at one point considered a fibromyalgia diagnosis, submitted a request to mental health services that specifically asked for Alcon to be evaluated for somatization disorder." Docket No. 34 at 13.

8

report from July 2014 stated:

> The patient has no medical, physiological or anatomic reasons for his pain syndrome or his antalgic gait. Currently, he is using crutches to ambulate. We are having psychiatry to [*sic*] work with him for possible somatization or conversion disorder. Providing the patient with narcotics and/or other medications that have significant risks of side effects is, certainly, not indicated in a patient without evidence of a diagnosis for pain syndrome. However, the patient does work significantly at ambulating with his antalgic gait. I do not believe the patient [i]s malingering, although this could be the case; it is most likely somatization.
>
> I believe the patient most likely, does really feel like he is in pain, although he has no medical, physiologic or anatomic reason to be in pain. So the question arises of does one assist a patient with an accommodation who doe [*sic*] not have a medical indication for such, such as crutches or a cane. Certainly, I would not want to [*sic*] him in a wheelchair, as prolonged wheelchair use would cause weakness, atrophy and joint contractures and, thus, would go against the philosophy of first do no harm in treating medically.
>
> Assisting the patient with crutches, which appears to be useful at this time, has caused him increased pain in his hands from pressure of supporting his body weight, so the question arises of are we causing more harm by giving him crutches. Again, there is not physical, anatomic or medical harm caused by using crutches, but his sensation of pain is increased on his hands. The cane would be another option where he can take pressure off of his left foot when ambulating; however, again, he will have increased pain in the palm of his right hand when using the cane to support his left leg, and it would cause him to continue to not bear weight on the left leg, which can cause atrophy and weakness and increase pain, because he does not step normally on the left foot. Therefore, at the current time, we will continue to supply the patient with crutches and will discuss this with the medical team in trying to come up with a medical bioethical plan to support the patient in his ambulation without medical evidence for treatment.

Docket No. 34-4 at 28.

Alcon declares that, during the July 30, 2014 evaluation, Dr. Bright made a telephone call in which he discussed Alcon's case at length with an unknown party without allowing Alcon to participate in the telephone conversation. Docket No. 10-2 at 56. After the call, Dr. Bright reviewed Alcon's file and physically examined Alcon. *Id.*

Thereafter Alcon received regular consultations with the medical department. Additionally, he attended consultations in the Psychiatry Department, and met with mental health

9

clinicians on eleven occasions between September 2014 and February 2015. He also received gabapentin, although he was slowly weaned off the gabapentin. Alcon stated that Tylenol did not help him. Alcon eventually refused to take Elavil, an antidepressant that had been prescribed for him.

Doctors working for the State of California providing medical services to inmates are governed by the California Correctional Health Care Services guidelines, which have been put in place by the California Prison Health Care Receivership Corporation. The guidelines include criteria for referrals to specialists. *See* Docket No. 34 at 6; Docket No. 34-1 at 8. Applying those guidelines, Dr. Bright did not think he needed to refer Alcon to an outside specialist because Dr. Bright did not believe that he (Dr. Bright) needed assistance with the diagnosis, there was no medical procedure or surgery Alcon wanted that could alleviate Alcon's symptoms, and Dr. Bright believed he was able to provide the treatment necessary for someone with Alcon's symptoms. Docket No. 34 at 6.

**VENUE AND JURISDICTION**

Venue is proper in the Northern District of California under 28 U.S.C. § 1391 because the events or omissions giving rise to Alcon's complaint occurred in Monterey County, located in the Northern District. *See* 28 U.S.C. §§ 84, 1391(b). This Court has federal question jurisdiction over this action under 42 U.S.C. § 1983. *See* 28 U.S.C. § 1331.

**LEGAL STANDARD FOR SUMMARY JUDGMENT**

Summary judgment is proper where the pleadings, discovery, and affidavits show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily

renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A fact is material if it might affect the outcome of the suit under governing law, and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Generally, the moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. The burden then shifts to the nonmoving party to "go beyond the pleadings and by [his or her] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (citations omitted).

A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is based on personal knowledge and sets forth specific facts admissible in evidence. *See Schroeder v. McDonald*, 55 F.3d 454, 460 & fn.10-11 (9th Cir. 1995) (treating plaintiff's verified complaint as an opposing affidavit where, even though verification was not in conformity with 28 U.S.C. § 1746, plaintiff stated under penalty of perjury that contents were true and correct, and allegations were not based purely on his belief but on his personal knowledge). Here, Alcon's pleadings were signed under penalty of perjury and are therefore considered as evidence for purposes of deciding the motion.

The court's function on a summary judgment motion is neither to make credibility determinations nor to weigh conflicting evidence with respect to a disputed material fact. *See T.W. Elec. Serv. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The evidence must be viewed in the light most favorable to the nonmoving party, and the inferences to be drawn from the facts must be viewed in a light most favorable to the nonmoving party. *Id.* at 631.

**DISCUSSION**

A.  **Eighth Amendment Claim**

Deliberate indifference to an inmate's serious medical need violates the Eighth

11

Amendment. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004). A defendant violates the Eighth Amendment only when two requirements are met: (1) the deprivation is, objectively, sufficiently serious, and (2) the official is, subjectively, deliberately indifferent to the inmate's health or safety. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

### 1. Objective Prong

There must be an objectively serious medical need to establish the objective prong of an Eighth Amendment claim. A "serious" medical need exists if the failure to treat an inmate's condition could result in further significant injury or the "unnecessary and wanton infliction of pain." *Id.* The evidence in the record, showing that Alcon suffered from chronic pain and experienced painful ambulation, suffices to permit a jury to find the existence of an objectively serious medical need. *Cf. Lolli v. Cnty. of Orange*, 351 F.3d 410, 419 (9th Cir. 2003) (Type I diabetes is a serious medical need). Dr. Bright does not dispute that Alcon had a serious medical need.

### 2. Subjective Prong

The subjective prong of the Eighth Amendment requires that the defendant exhibit deliberate indifference. A defendant is deliberately indifferent if he knows that an inmate faces a substantial risk of serious harm and disregards that risk by failing to take reasonable steps to abate it. *Farmer*, 511 U.S. at 837. The defendant must not only "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," but he "must also draw the inference." *Id.* If the defendant should have been aware of the risk, but was not, then he has not violated the Eighth Amendment, no matter how severe the risk. *Gibson v. Cnty. of Washoe*, 290 F.3d 1175, 1188 (9th Cir. 2002). Deliberate indifference may be demonstrated when prison officials deny, delay or intentionally interfere with medical treatment, or it may be inferred from the way in which prison officials provide medical care. *See McGuckin v. Smith*,

974 F.2d 1050, 1062 (9th Cir. 1992) (finding that a delay of seven months in providing medical care during which a medical condition was left virtually untreated and plaintiff was forced to endure "unnecessary pain" sufficient to present colorable § 1983 claim).

Negligence does not amount to deliberate indifference. Thus, a doctor's negligence, such as a negligent misdiagnosis, would not be enough to establish an Eighth Amendment violation. S*ee Wilhelm v. Rotman*, 680 F.3d 1113, 1122-23 (9th Cir. 2012) (finding no deliberate indifference but merely a "negligent misdiagnosis" by defendant-doctor who decided not to operate because he thought plaintiff was not suffering from a hernia).

A difference of opinion as to which medically acceptable course of treatment should be followed does not establish deliberate indifference. *See Toguchi v. Chung*, 391 F.3d 1051, 1058 (9th Cir. 2004); *Sanchez v. Vild*, 891 F.2d 240 (9th Cir. 1989). "[T]o prevail on a claim involving choices between alternative courses of treatment, the prisoner must show that the chosen course of treatment 'was medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of an excessive risk to the prisoner's health.'" *Toguchi,* 391 F.3d at 1058; *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996) (citing *Farmer*, 511 U.S. at 837).

Having carefully reviewed the evidence, the Court concludes that no reasonable jury could find in Alcon's favor on his Eighth Amendment claim against Dr. Bright. Alcon fails to present evidence that would allow a reasonable jury to find that Dr. Bright was deliberately indifferent when he denied a request to increase Alcon's Neurontin prescription, when he diagnosed Alcon as having something other than fibromyalgia, or when he did not send Alcon to a rheumatologist.

Alcon fails to present evidence that would allow a reasonable jury to find that Dr. Bright acted with deliberate indifference in May 2012 when he denied the request to increase the dosage of Neurontin. The undisputed evidence is that Dr. Bright decided to end the Neurontin prescription because, in his medical judgment, the Neurontin was unnecessary and may have been doing more harm than good. Alcon does not dispute that his lab results showed that he had low platelets, possibly as a result of the Neurontin he had been taking, and was receiving another

pain medication. The records show that Alcon was prescribed Neurontin on later occasions. However, the fact that other healthcare providers prescribed Neurontin does not support a reasonable inference that Dr. Bright was deliberately indifferent to Alcon's needs in denying the request on this occasion because there is no evidence about the circumstances surrounding the later prescriptions (e.g., whether Alcon at those times had low platelet lab results, whether he was taking other pain medications, and whether the Neurontin was being prescribed for pain or seizures). Alcon had to, but did not, produce evidence that would allow a reasonable jury to conclude that Dr. Bright's decision to end the Neurontin prescription was medically unacceptable under the circumstances and chosen in conscious disregard of an excessive risk to Alcon's health. *See Toguchi*, 391 F.3d at 1058.

Next, Alcon fails to present evidence that would allow a reasonable jury to find that Dr. Bright acted with deliberate indifference in diagnosing him as having somatization disorder rather than fibromyalgia. Dr. Bright presents evidence showing that his refusal to diagnose Alcon as having fibromyalgia was medically appropriate rather than deliberately indifferent. From May 2012 to July 2014, Dr. Bright evaluated Alcon and made treatment recommendations on several occasions. On at least three occasions, Dr. Bright conducted a full-scale medical evaluation, each time reviewing Alcon's complaints and medical records, and examining the patient. Alcon's evidence that Dr. Bright excluded him from a lengthy telephone conversation about his case during the July 30, 2014 examination might show rudeness, but rudeness is not the same thing as deliberate indifference. Further, Alcon admits that Dr. Bright reviewed his file and physically examined him after that telephone call. The failure to let Alcon participate in the telephone conversation does not show a triable issue in support of his claim that Dr. Bright was deliberately indifferent.

Dr. Bright diagnosed Alcon with somatization, major depression, adjustment disorder, and possibly conversion disorder based on the examinations as well as review of CT scans and X-rays, laboratory data, and reports from Alcon's consultations with neurologists and a podiatrist. Dr. Bright determined that Alcon does not suffer from fibromyalgia and therefore

14

recommended evaluation and treatment for depression and somatization. Before Dr. Bright determined that Alcon had somatization, he had granted requests for a cane, a lower bunk, and a ground floor cell. After diagnosing him with somatization, Dr. Bright approved crutches to aid Alcon's walking while also protecting the muscles from the atrophy that would occur if he was in a wheelchair. Although Dr. Bright approved only a few of the several accommodation requests made by Alcon, he provided undisputed evidence that his decisions were medically sound.

The evidence in the record shows that fibromyalgia and somatization disorder have many similarities in symptoms, with fibromyalgia being characterized by widespread chronic pain, and somatization involving complaints of chronic pain concerning different areas of the body. The evidence in the record also shows that there is no definitive physical test to diagnose fibromyalgia. Based on his evaluation of Alcon, Dr. Bright determined that Alcon's symptoms were not consistent with fibromyalgia. He pointed to several factors that led him to this determination, such as Alcon's hypersensitivity to touch in certain areas and his reports of pain everywhere on his body. Additionally, in the August 2013 report, Dr. Bright noted that Alcon labored on his way to the evaluation and briskly departed after being rejected. In his July 2014 report, Dr. Bright observed that Alcon was wearing high-top leather boots with athletic socks, and was wearing around his neck a beaded necklace with a leather pouch. "With the patient being so sensitive to his skin, it is a little surprising that he wears a neck[lace] or high top boots or athletic socks—things that may cause more pressure on his skin." Docket No. 34-4 at 26. Dr. Bright concluded that Alcon's symptom of pain, while palpable and real to Alcon, was likely the result of somatization. Dr. Bright also presented evidence that he considered the most appropriate bioethical treatment for Alcon, and weighed the need to address Alcon's pain complaints against potential harms that could result from issuing Alcon a wheelchair or a cane before deciding that crutches would be the most appropriate form of treatment under the circumstances.

Dr. Bright was not alone in thinking Alcon had somatization disorder. After several

15

encounters with Alcon, Dr. Hedden eventually concluded that Alcon had "somatoform disorder." Docket No. 34-3 at 10. Also, several of Dr. Lam's notes indicate he was considering both somatization and fibromyalgia in 2013-2014. *See* Docket No. 34-3 at 30, 36, and 48 (assessment notes mentioning "somatoform vs. fibromyalgia"); Docket No. 34-4 at 14 (noting a plan for a psychiatry referral for somatization disorder).

Alcon strongly disagrees with Dr. Bright's diagnosis and treatment recommendations, but merely disagreeing with the doctor, or even pointing to other doctors' conflicting diagnoses, does not show a triable issue in support of his claim that Dr. Bright was deliberately indifferent. Alcon had to, but did not, produce evidence that would allow a reasonable jury to conclude that Dr. Bright's diagnosis of somatization rather than fibromyalgia was medically unacceptable under the circumstances and chosen in conscious disregard of an excessive risk to Alcon's health. *See Toguchi*, 391 F.3d at 1058. Notably, Alcon does not present any evidence that the psychiatrists have ruled out somatization disorder as an appropriate diagnosis.

Alcon's third claim is that Dr. Bright had to refer Alcon to a rheumatologist because he was not qualified to diagnose or treat a patient with fibromyalgia. The evidence in the record shows that Dr. Bright was at all relevant time a licensed physician qualified to diagnose and treat patients with fibromyalgia. The fact that Dr. Bright held an O.D. rather than an M.D. degree is a distinction without a difference, as Alcon has not provided any evidence that doctors of osteopathy are unqualified to diagnose or treat fibromyalgia and mental disorders. The evidence is undisputed that Dr. Bright chose not to send Alcon to a rheumatologist because he did not think Alcon required such a referral. Dr. Bright's decisions not to send Alcon to a rheumatologist and to refer him to the Psychiatry Department were consistent with his determination that Alcon's complaints of pain stemmed from a mental rather than a physiological cause. Alcon does not dispute Dr. Bright's evidence that the California Correctional Health Care Services Pain Management Guidelines concerning specialty referrals did not require him to refer Alcon to a specialist. *See* Docket No. 34-1 at 8 ("[i]n those patients suffering from moderate to severe chronic pain who continue to have impaired functionality, the

provider *may* consider referral to a Specialist. Referral for medication management alone is generally not indicated."). Although referral to an outside specialist also would not have been prohibited under the guidelines, Alcon has failed to present any evidence that the refusal to refer him to a rheumatologist reflected deliberate indifference by Dr. Bright. (Dr. Bright was not alone in refusing to send him to a rheumatologist: Dr. Hedden also refused to send him to a rheumatologist because his symptoms did not meet the criteria for such a referral). As with his other arguments, Alcon's desire to be sent to a rheumatologist shows only a difference of opinion. With regard to the rheumatologist, Alcon does not even show that it is a difference of opinion between doctors because he does not present evidence that another doctor recommended that he should see a rheumatologist. On the evidence in the record, no reasonable jury could find that Dr. Bright's decision not to refer him to a rheumatologist was medically unacceptable and was chosen in conscious disregard of an excessive risk to Alcon's health. *See Toguchi*, 391 F.3d at 1058.

Viewing the evidence in the light most favorable to Alcon, no reasonable jury could return a verdict against Dr. Bright on Alcon's Eighth Amendment claim.

### B.  There Is No Separate Due Process Claim

Dr. Bright argues that Alcon cannot state a § 1983 claim for Dr. Bright's handling of his inmate appeals. Dr. Bright is correct that a due process claim is not stated. The failure to grant relief on Alcon's inmate appeals does not give rise to a separate due process claim under § 1983. There is no constitutional right to a prison administrative appeal or grievance system in California, and therefore no due process liability for failing to process or decide an inmate appeal properly. *See Ramirez v. Galaza*, 334 F.3d 850, 860 (9th Cir. 2003); *Mann v. Adams*, 855 F.2d 639, 640 (9th Cir. 1988).

An alleged refusal to properly process or properly resolve an inmate's appeal might nonetheless have a bearing on his Eighth Amendment claim. If a defendant only denied an inmate appeal about a medical problem that already had occurred and was complete (e.g., a

failure to treat a broken leg that had long since healed), there would be no liability for a constitutional violation; however, where the problem is an ongoing medical need and the request is made in an inmate appeal to remedy the ongoing problem, Eighth Amendment liability could be based on the denial of an inmate appeal, just as it could be based on the denial of a verbal request from the inmate. *Cf. Jett v. Penner*, 439 F.3d 1091, 1098 (9th Cir. 2006) (supervisor may be liable for deliberate indifference to a serious medical need, for instance, if he or she fails to respond to a prisoner's request for help). The bottom line is that medical and other decisions made in the context of inmate appeals and requests for accommodations will not give rise to liability under the Due Process Clause, but those same decisions might, in some circumstances, form the basis for a defendant's liability under the Eighth Amendment. Here, the Court has considered Dr. Bright's actions in response to inmate appeals and accommodation requests for the purpose of adjudicating the Eighth Amendment claim.

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is GRANTED. Docket No. 33. Defendant is entitled to judgment as a matter of law on Alcon's amended complaint. The clerk shall close the file.

**IT IS SO ORDERED**.

Dated: March 1, 2016

SUSAN ILLSTON
United States District Judge